No. 23-20080

IN THE

# United States Court of Appeals for the Fifth Circuit

In re ARTHUR BROWN, JR.,
*Movant.*

## OPPOSITION TO MOTION FOR ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER SECOND OR SUCCESSIVE PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

KEN PAXTON
Attorney General of Texas Div.

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

TOMEE M. HEINING
Deputy Chief, Criminal Appeals

*Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
tomee.heining@oag.texas.gov

*Counsel for Respondent*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Respondent*

Bobby Lumpkin, Director
TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION

*Counsel for Respondent*

Tomee M. Heining, Deputy Chief, Criminal Appeals Division
OFFICE OF THE ATTORNEY GENERAL OF TEXAS

*Movant*

Arthur Brown, Jr.

*Counsel for Movant*

Jeremy Shepers
Derek VerHagen
OFFICE OF THE FEDERAL PUBLIC DEFENDER, NORTHERN DISTRICT OF TEXAS

s/Tomee M. Heining
TOMEE M. HEINING
Deputy Chief, Criminal Appeals Division

i

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...........................................i

TABLE OF CONTENTS ...............................................................ii

TABLE OF AUTHORITIES................................................................iv

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF THE ISSUE.............................................................3

STATEMENT OF THE CASE ...............................................................3

I.     Procedural History..............................................................3

II.    Facts Concerning the Guilt-Innocence Stage. ...................... 8

III.   Evidence Relating to Punishment .................................11

SUMMARY OF THE ARGUMENT .........................................11

STANDARD OF REVIEW......................................................12

ARGUMENT ..........................................................................13

I.     The Court Should Deny Authorization to File a Successive Application Because Brown Does Not Meet the Standards under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition ................................................................. 13

A.     Brown's *Brady* claim is barred under § 2244(b)(2)(A)..........14

B.     Brown's claim is barred by § 2244(b)(2)(B)..........................22

       1.    Brown fails to show diligence as required by § 2244(b)(2)(B)(i) ......................................................22

       2.    Brown fails to show innocence as required by § 2244(b)(2)(B)(ii) .....................................................26

       3.    Brown's *Brady* claim fails on the merits ....................35

C.    The statute of limitations precludes authorization ............... 39

CONCLUSION ........................................................... 41

CERTIFICATE OF SERVICE ................................................ 42

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ........................ 43

ELECTRONIC CASE FILING CERTIFICATIONS .............................. 43

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Adams v. Thaler*, 679 F.3d 312 (5th Cir. 2012) ......................................12

*Atkins v. Virginia*, 536 U.S. 304 (2002) ................................. 16, 17, 18 25

*Banks v. Dretke*, 540 U.S. 668 (2004)................................................ 35, 38

*Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018)....................... 15, 16, 18

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................ *passim*

*CSX Transp. Inc. v. Ala. Dept. Rev.*, 562 U.S. 277 (2011) ......................21

*Ex parte Kimes*, 872 S.W.2d 700 (Tex. Crim. App. 1993) .......................31

*Felker v. Turpin*, 518 U.S. 651 (1996).....................................................12

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) ............................38

*In re Campbell*, 750 F.3d 523 (5th Cir. 2014) ................................... 13, 40

*In re Cathey*, 857 F.3d 221 (5th Cir. 2017) ................................... *passim*

*In re Davila*, 888 F.3d 179 (5th Cir. 2018)..............................................15

*In re Halprin*, 788 F. App'x 941 (5th Cir. Sept. 23, 2019) .............. *passim*

*In re Johnson*, 935 F.3d 284 (5th Cir. 2019) ................................. *passim*

*In re Milam*, 838 F. App'x 796 (5th Cir. 2020)........................................25

*In re Soliz*, 938 F.3d 200 (5th Cir. 2019)................................................25

*In re State ex rel. Ogg*, No. WR-93,812-01, 2022 WL 1670500 (Tex. Crim. App. May 25, 2022) ................................................................................5

*In re State of Texas ex rel. Ken Paxton,* No. WR-94,432-01 (Tex. Crim. App. Jan. 4, 2023) ...........................................................................6, 7

*In re Will*, 970 F.3d 536 (5th Cir. 2020)................................................27

*Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006) .............................. 16, 19

*Kyles v. Whitely*, 514 U.S. 419 (1995) ..................................................... 36

*Leal Garcia v. Quarterman*, 573 F.3d 214 (5th Cir. 2009) ..................... 15

*Russello v. United States*, 464 U.S. 16 (1983)......................................... 21

*Thomas v. Lumpkin*, 995 F.3d 432 (5th Cir. 2021)................................. 37

*Tumey v. Ohio*, 273 U.S. 510 (1927)....................................................... 17

*Tyler v. Cain*, 533 U.S. 656 (2001) .................................................. 19, 20

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ................................... 37

*Williams v. Thaler*, 602 F.3d 291 (5th Cir. 2010) .................................. 13

## Statutes

28 U.S.C. § 2244 ....................................................................... 1, 13, 41

28 U.S.C. § 2244(b) ................................................................. 12, 13, 18

28 U.S.C. § 2244(b)(1)...................................................................... 13

28 U.S.C. § 2244(b)(2)....................................................................2, 3

28 U.S.C. § 2244(b)(2)(A)....................................................... *passim*

28 U.S.C. § 2244(b)(2)(B)................................................... 14, 15, 16, 19

28 U.S.C. § 2244(b)(2)(B)(i) ....................................................... 15, 16, 19

28 U.S.C. § 2244(b)(2)(B)(ii) ........................................................ 15, 19

28 U.S.C. § 2244(b)(3)(A)...............................................................3, 12

28 U.S.C. § 2244(b)(3)(C)................................................................ 13

28 U.S.C. § 2254(e)(1)................................................................... 37

Texas Code of Criminal Procedure, Article 11.071, Section 5(a) ......... 1, 4

**Rules**

Fed. R. Civ. Proc. 15(a).................................................................25

Movant, Arthur Brown, Jr. was convicted of capital murder and sentenced to death in November 1993, for the June 20, 1992 murders of Jessica Quinones, Jose Guadalupe Tovar, Audrey Brown, and Frank Farias during the same criminal transaction. After unsuccessfully appealing his conviction through both state and federal district court, this Court denied an application for a certificate of appealability (COA), on June 12, 2012. *Brown v. Thaler*, 684 F.3d 482 (5th Cir. 2012), *cert. denied,* 568 U.S. 1164 (2013).

Brown's first execution date, set for October 29, 2013, was stayed by agreement of the parties, to allow for the retesting of ballistics evidence. The Texas Court of Criminal Appeals (CCA) authorized a subsequent state habeas application, pursuant to Texas Code of Criminal Procedure, Article 11.071, Section 5(a), and remanded the case to the trial court for consideration of one allegation: whether the State's ballistics expert "testified falsely or in a materially misleading manner when he expressed his unequivocal opinion that the evidence bullets were fired from the two guns that the State recovered in Alabama and tied to [Brown]." *Ex parte Brown*, No. WR-26,178-03, 2015 WL 6522854 (Tex. Crim. App. October 28, 2015) (order).

Following a hearing the state trial court recommended that Brown be granted habeas relief, *see Ex parte Brown, Jr.*, No. 636535-B (351st Dist. Ct., Harris County, Texas); but, on October 18, 2017, the CCA declined to adopt the trial court's recommendation and denied habeas relief. *Ex parte Brown, Jr.*, No. 26,178-03, 2017 WL 4675396 (Tex. Crim. App. 2017), *cert. denied,* 139 S. Ct. 373 (Oct. 15, 2018).

On August 17, 2022, over thirty years after this crime was committed, the trial court signed an order setting Brown's execution date for March 9, 2023. On March 1, 2023, eight days before his scheduled execution date, Brown filed this motion for authorization to file a claim pursuant to the legal precedent set in *Brady v. Maryland,* 373 U.S. 83 (1963), but arguing previous legal unavailability of a claim for relief in his first federal habeas writ due to prosecutorial misconduct, and alleging the suppression of evidence known to exist at the time of trial, and available for review by, at least, federal habeas counsel. This Court should deny this motion for authorization because, under 28 U.S.C. § 2244(b)(2), new *Brady* claims must demonstrate prior factual unavailability and clear and convincing evidence of innocence. Brown cannot meet this standard.

# STATEMENT OF JURISDICTION

This Court has jurisdiction over a motion for authorization to file a successive petition pursuant to 28 U.S.C. § 2244(b)(3)(A).

# STATEMENT OF THE ISSUE

Should the Court grant authorization to file a successive writ in the federal district court pursuant to 28 U.S.C. § 2244(b)(2) for a claim that was both factually and legally available to raise in his first federal habeas writ, and which does not amount to clear and convincing evidence of innocence?

# STATEMENT OF THE CASE

## I.     Procedural History

Brown was convicted and sentenced to death for the murders of Jessica Quinones, Jose Guadalupe Tovar, Audrey Brown, and Frank Farias during the same criminal transaction. CR 7, 485, 520-22, 526-27.[1] On December 18, 1996, the CCA affirmed Brown's conviction and sentence in an unpublished opinion, *Brown, Jr. v. State*, No. 71,817 (Tex.

---

[1]     "CR" refers to the clerk's record of pleadings and documents filed with the court during trial, followed by page number(s). "RR" refers to the state record of transcribed trial proceedings, preceded by volume number and followed by page number(s). "SHCR" refers to the state habeas clerk's record of Brown's first state habeas proceeding, followed by page number(s).

Crim. App.), *cert. denied*, 522 U.S. 940 (1997). On June 18, 2008, the CCA denied state habeas relief. *Ex parte Brown*, No. 26,178-02 (Tex. Crim. App. 2008).[2]

On February 28, 2011, the United States District Court for the Southern District of Texas, Houston Division, denied a federal petition for writ of habeas corpus, and a COA. *Brown v. Thaler,* No. 4:09-CV-00074, 2011 WL 798391 (S.D. Tex.). On June 12, 2012, the Fifth Circuit Court of Appeals also denied Brown a COA. *Brown v. Thaler*, 684 F.3d 482 (5th Cir. 2012), *cert. denied,* 568 U.S. 1164 (2013).

On July 2, 2013, the convicting court entered an order scheduling Brown's execution for October 29, 2013. By agreement of the parties, the convicting court withdrew Brown's execution date to allow for the retesting of ballistics evidence.

Brown then filed a subsequent habeas application alleging multiple grounds of prosecutorial misconduct and ineffective assistance of counsel. The CCA determined that only one of Brown's claims satisfied the requirements of Texas Code of Criminal Procedure, Article 11.071,

---

[2]    Brown's first postconviction filing was a petition for writ of mandamus. *Ex parte Brown*, No. 26,178-01.

Section 5(a), and remanded the case to the trial court for consideration of the following allegation: whether the State's ballistics expert Anderson "testified falsely or in a materially misleading manner when he expressed his unequivocal opinion that the evidence bullets were fired from the two guns that the State recovered in Alabama and tied to [Brown]." *Ex parte Brown*, No. WR-26,178-03, 2015 WL 6522854 (Tex. Crim. App. Oct. 28, 2015) (order).

Following a hearing, the state trial court recommended that Brown be granted habeas relief on the above claim. *Ex parte Brown, Jr.*, No. 636535-B (351st Dist. Ct., Harris County, Texas). However, on October 18, 2017, the CCA declined to adopt the trial court's recommendation and denied habeas relief. *Ex parte Brown, Jr.*, No. 26,178-03, 2017 WL 4675396 (Tex. Crim. App. 2017). The Supreme Court denied certiorari review. *Brown v. Texas,* 139 S. Ct. 373 (Oct. 15, 2018).

After the State moved for leave to file a petition for writ of mandamus, seeking to compel the trial court to set an execution date*, see In re State ex rel. Ogg,* No. WR-93,812-01, 2022 WL 1670500 (Tex. Crim. App. May 25, 2022), and the CCA ordered additional briefing, *see id.,* 2022 WL 2344100 (Tex. Crim. App. June 29, 2022), the trial court signed

an order setting Brown's execution date for March 9, 2023. The CCA
dismissed the pending proceeding as moot. *Id.*, 2023 WL 1425683 (Tex.
Crim. App. Feb. 1, 2023).

On January 8, 2022, Brown filed a motion to intervene in an
Original Verified Petition and Application for Temporary Injunction,
Declaratory Relief, and Permanent Injunction in Travis County District
Court, filed on December 16, 2022, by Dallas County death row inmate
Wesley Ruiz and Potter County death row inmate John Balentine, and
later joined by Harris County death row inmate Robert Fratta and then
Brown. The death row inmates, all scheduled for execution in the
upcoming months, sought to enjoin TDCJ from using allegedly expired
pentobarbital in their scheduled executions. However, on January 4,
2023, the CCA granted Texas Attorney General Ken Paxton leave to file
an application for writ of prohibition and ordered the district court judge
"to refrain from issuing any order purporting to stay the January and
February executions of Harris County death row inmate [Fratta], Dallas
County death row inmate [Ruiz], or Potter County death row inmate
[Balentine]." Mem. Opinion at 2-3, *In re State of Texas ex rel. Ken Paxton,*

No. WR-94,432-01 (Tex. Crim. App. Jan. 4, 2023).[3] And when the district court judge nevertheless granted a motion for temporary injunction ordering TDCJ officials to refrain from using expired pentobarbital to execute the four death row inmates until the case reached final judgment following a trial set for March 20, 2023, the CCA granted Attorney General Paxton's application for writ of mandamus and vacated the temporary injunction order, and again ordered the judge "'to refrain from issuing any order purporting to stay the' executions of the various inmates." *In re State of Texas Ex. Rel. Ken Paxton,* No. 94,432-02 (Jan. 10, 2023).[4]

On March 1, 2023, Brown filed a second subsequent application for state habeas relief in the CCA—his third state writ—raising this *Brady* claim, and several others. He also filed a motion for stay. And, in the 351st District Court of Harris County, Texas, Brown filed a Chapter 64 motion for postconviction DNA testing, and a motion to withdraw his execution date. This litigation remains pending.

---

[3]    This order was entered before Brown joined the litigation.

[4]    This proceeding remains pending, although TDCJ has filed a plea challenging the district court's jurisdiction to hear the case. A hearing is set on this still-pending motion for March 8, 2023. Fratta, Ruiz, and Balentine were executed as scheduled.

Also on March 1, 2023, Brown filed in this Court the present motion for authorization to file a successive writ in the federal district court, and a motion for stay of his execution date. The Director opposes these motions.

## II.    Facts Concerning the Guilt-Innocence Stage.

The CCA accurately summarized the evidence from the guilt-innocence phase of trial as follows:

> On the evening of June 20, 1992, at the Houston home of Rachel Tovar, six people were shot, four of whom died. Rachel Tovar was one of the survivors of the assault. In the hospital immediately after the incident, Tovar gave a recorded oral statement in which she stated that "Squirt" was one of the perpetrators and described the van he and his friends were driving. She subsequently identified [Brown] in a photospread. At trial Tovar identified [Brown] as the man she had referred to as "Squirt." Others also testified that [Brown] was known as "Squirt." Tovar further testified that she and her husband had sold marijuana and cocaine to [Brown] on several occasions. Tovar testified that on the day of the offense [Brown] and his friends came to her house about 2:00 or 3:00 in the afternoon to discuss the purchase of some cocaine and that they were driving a beige minivan. They left and returned around 6:00 p.m., and then left again only to return to the house a couple of hours later, at which time the shootings took place. Tovar testified that [Brown] bound her and five others who were in the house with strips of bedsheets [Brown] cut with a knife. The bound individuals were then placed in various rooms throughout the house. She heard gunshots from the other rooms and then she was shot. Tovar testified that she did not know who shot her, although she saw

each of the three perpetrators with a gun at various times during the assault.

The other survivor, Nicholas Cortez Anzures, testified that he had gone to visit the Tovars at about 10:00 p.m. on the evening of the murders. He stated that he drove to the Tovars' house with some friends who waited for him in the car outside. He knocked on the door and was forced inside by [Brown] who was pointing a gun at the head of one of the victims. Cortez was taken to a back room by [Brown] and one of his cohorts, where he was bound and gagged. Cortez testified he heard a woman scream and shots from the front of the house. Then "the man with the chrome gun" and [Brown] came into the room and the man with the gun shot Cortez and another victim.

Candelario Hernandez testified that he drove with Cortez to the Tovars' house and waited in the car, expecting Cortez to return to the car quickly so that they could proceed to a party they planned to attend. Shortly after Cortez went inside Hernandez heard two sets of shots coming from the house and observed two black men exit the front door, get into a minivan, and drive away.

Rachel Tovar's neighbor testified that he was sitting in his front yard the night of the offense. He observed a van parked outside the Tovars' house and saw a black man going back and forth between the van and the house and putting something in the van. He further testified he heard three "popping sounds" and then the van left.[5] Shortly thereafter Rachel Tovar emerged from the house injured and calling for help.

Still another person, Daniel Leija, testified to having been at the Tovars' house earlier in the evening and seeing [Brown]

---

[5]    His statement given to police following the offense stated that the van pulled away <u>and then</u> he heard the popping sounds. At trial he stated that was not correct, that he had heard the pops before the van left. [FN in original].

there. He also testified that he had seen a van parked in front of the house.

[Brown's] three sisters, Serisa Brown, Grace Brown and Carolyn Momoh, were all called as witnesses for the State. At the time of the offense, Serisa and her child and Carolyn and her two children were living with Grace at Grace's house in Houston. The sisters all testified that [Brown] and three of his friends, Marion Dudley, Tony Dunson, and Maliek Travis, came to Grace's house in the early morning hours of June 20th. [Brown] and his friends were driving a tan minivan with Alabama plates. They left and returned several times that day and evening. Sometime after midnight that night [Brown] asked Serisa and Carolyn to drive the van back to Tuscaloosa, Alabama for him the next morning.[6] He agreed to pay each of them $1,000 in return for driving the van.[7] Serisa and Carolyn took [Brown] to the airport the morning of June 21st and then the two women and their children left for Tuscaloosa in the van. Upon arrival in Tuscaloosa, Carolyn spoke with Grace by phone who informed Carolyn of a news report she had seen pertaining to the murder of several persons and stating that a van with Alabama plates was identified as having been at the scene. Carolyn and Serisa turned the van over to [Brown] and his friends in Tuscaloosa and collected their money. Carolyn and Serisa eventually gave statements to Alabama authorities, and all three of the sisters gave statements to the Houston police on June 26th.

*Brown, Jr. v. State*, No. 71,817, slip op. at 31-33 (Tex. Crim. App. 1996)

(emphasis and footnotes in original).

---

[6]   [Brown's] residence was in Tuscaloosa and his parents also lived there. [FN in original].

[7]   Serisa testified that the money was payment for delivering cocaine that was in the van. Carolyn testified that she had no knowledge of drugs in the van. [FN in original].

## III.  Evidence Relating to Punishment

This Court summarized the evidence related to punishment as

follows:

> At the punishment phase of Brown's trial, the State re-offered
> all of the evidence presented at the guilt-innocence phase. The
> State also presented evidence that Brown had committed an
> armed robbery in Tuscaloosa four years earlier; that he had
> extorted other prisoners while in the Harris County Jail
> awaiting trial; and that he had assaulted a deputy at the
> Harris County Jail. The defense presented Brown's school
> records, which reflected that he had a low IQ, suffered from
> learning disabilities, and performed poorly in special
> education classes.[8] The defense also presented the testimony
> of a law professor that convicted, incarcerated offenders
> become less violent as they age. The jury answered
> affirmatively the special punishment issues on future danger
> and whether Brown actually caused the deaths, intended to
> kill the victims, or anticipated that human life would be
> taken. It answered negatively the special punishment issue
> on mitigating circumstances. The trial court sentenced Brown
> to death.

*Brown v. Thaler,* 684 F.3d at 486.

## SUMMARY OF THE ARGUMENT

Brown is not entitled to authorization under § 2244(b) because he

fails to show that his proposed claim either relies on a new rule of

constitutional law, *see* § 2244(b)(2)(A), or is predicated on previously

---

[8]    During deliberations at the punishment phase, the jury sent out a note
asking to see Brown's school records. [FN in original].

unavailable facts that call into question the accuracy of his conviction for capital murder, *see* § 2244(b)(2)(B). Accordingly, this Court should deny Brown's motion for authorization.

## STANDARD OF REVIEW

A habeas petitioner must "obtain leave from the court of appeals before filing a second habeas petition in the district court." *Adams v. Thaler*, 679 F.3d 312, 321 (5th Cir. 2012); *see Felker v. Turpin*, 518 U.S. 651, 664 (1996); 28 U.S.C. § 2244(b)(3)(A). Under § 2244(b),

(1)   A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2)   A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless-

   (A)   the Applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

   (B)

      (i)   the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii)    the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the Applicant guilty of the underlying offense.

28 U.S.C. § 2244(b). As discussed below, Brown's Motion fails to make a prima facie showing that he satisfies the requirements of § 2244(b). *See* 28 U.S.C. § 2244(b)(3)(C).

## ARGUMENT

**I.    The Court Should Deny Authorization to File a Successive Application Because Brown Does Not Meet the Standards under 28 U.S.C. § 2244 for Filing a Successive Habeas Corpus Petition.**

Before authorizing permission to file a successive petition in the lower court, this Court must determine that he satisfies the statutory prerequisites for a successive habeas petition. *In re Campbell*, 750 F.3d 523, 529–30 (5th Cir. 2014). If a claim has been previously raised, it must be dismissed—there are no exceptions. § 2244(b)(1); *Williams v. Thaler,* 602 F.3d 291, 301 (5th Cir. 2010). If a claim has not been previously raised, it also must be dismissed, unless the movant makes a prima facie showing that his claim: (A) "relies on a new rule of constitutional law,

made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (b) relies on facts that (i) could not have been discovered previously through the exercise of due diligence, and (ii) if proven would "establish by clear and convincing evidence that, but for Constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(A)-(B). Brown cannot meet either standard.

## A.    Brown's *Brady* claim is barred under § 2244(b)(2)(A).

While recognizing that *Brady* was decided in 1963—nearly sixty years ago, and forty–six years before he filed his first federal habeas writ—Brown nevertheless argues that he can make a prima facie showing that *Brady* is "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" to him, and that his claim satisfies § 2244(b)(2)(A). Motion at 32–34. Brown argues that the State's alleged misconduct at trial rendered the *Brady* decision previously unavailable to him. Motion at 34. Relying on two cases involving successive intellectual disability claims, Brown contends that because his claim had no possibility of merit until he discovered the videotaped evidence in question, his *Brady* claim was

thus previously unavailable to him, and is thus sufficient to warrant further exploration by the district court. *See generally* Motion at 34–39; citing *In re Johnson*, 935 F.3d 284 (5th Cir. 2019); *In re Cathey,* 857 F.3d 221 (5th Cir. 2017). But Brown's efforts to conflate § 2244 (b)(2)(A) and (B) to allow the application of a rule decided over sixty-years ago to his late-discovered *Brady* claim must fail.

First, controlling precedent holds that § 2244 (b)(2)(A) does not apply to *Brady* claims, which must be analyzed under § 2244 (b)(2)(B). In *Blackman v. Davis,* this Court "conclusively" rejected the argument that *Brady* and false testimony claims are in tension with AEDPA's requirements for successive petitions under § 2244(b)(2)(B). 909 F.3d 772, 778 (5th Cir. 2018) (citing *In re Davila,* 888 F.3d 179, 184-87 (5th Cir. 2018) (applying statutory provision to *Brady* claims and holding the requirements for pursuing successive petition were not fulfilled); and *Leal Garcia v. Quarterman,* 573 F.3d 214, 221 (5th Cir. 2009) (emphasizing that "[s]ection 2244(b)(2)(B)(i) states that claims based on a *factual* predicate not previously discoverable are successive.") (emphasis in original)). Before going on to apply § 2244(b)(2)(B)(i) and (ii) to Blackman's claims, this Court held:

Blackman's *Brady* and *Giglio/Napue* claims rely on precisely such previously undiscovered facts and are therefore within the purview of the statutory language. Even more pointedly, this court refused to "collapse AEDPA's due diligence requirement [section 2244(b)(2)(B)(i)] into the *Brady* duty..." and concluded that the statutory requirements for a successive petition must be considered prior to evaluation of the merits of the petitioner's *Brady* claim. *Johnson v. Dretke,* 442 F.3d 901, 906-911 (5th Cir. 2006). We are bound by these clear precedents and proceed to examine whether Blackman's claims satisfy the statutory requirements.

*Blackman,* 909 F.3d. at 778-79. This Court should similarly proceed to the § 2244 (b)(2)(B) analysis.

But assuming § 2244(b)(2)(A) could ever apply to *Brady* claims, Brown's reliance on *In re Cathey* and *In re Johnson* for the proposition that a decades-old decision could be "previously unavailable," as intended by this statute, is misplaced, and has been previously rejected by this Court. *See In re Halprin,* 788 F. App'x 941, 943–44 (5th Cir. Sept. 23, 2019). In *Cathey* and *Johnson,* the petitioners filed their initial federal petitions after *Atkins*[9] but did not raise *Atkins* claims. *In re Johnson*, 935 F.3d at 287, 292; *In re Cathey*, 857 F.3d at 227. When they later sought authorization to raise their *Atkins* claims in successive petitions, they asserted that the claims were "previously unavailable" because, under

---

[9]     *Atkins v. Virginia*, 536 U.S. 304 (2002)

the earlier understandings of the diagnostic criteria for intellectual disability, their claims would have been futile. *In re Johnson*, 935 F.3d at 292-93. Based on the change in diagnostic criteria—that led to a change in the legal framework for reviewing *Atkins* claims—this Court found that the petitioners' claims were "previously unavailable" and, thus, satisfied subsection (A). *Id.*

But in *Halprin*, this Court rejected a movant's efforts to extend *Cathey* and *Johnson* to factual unavailability like Brown asserts here. This Court first rejected outright the idea that a claim relying on *Tumey v. Ohio,* 273 U.S. 510 (1927), relied upon a *new* rule of constitutional law. Rather, "a Supreme Court case decided in 1927 . . . is not a 'new rule' within the meaning of § 2244(b)(2)(A)." *Halprin,* 788 F. App'x at 944.

Second, the Court rejected Halprin's reliance on *Cathey* and *Johnson* to support a proposition that newly discovered evidence could demonstrate a claim was "previously unavailable" under § 2244(b)(2)(A). *Id.* at 944. The Court distinguished *Cathey* and *Johnson* on grounds of "legal unavailability" versus "factual unavailability." Namely, "*Cathey* and *Johnson* involved changes in diagnostic standards for intellectual disabilities, which then altered the legal standards for granting relief on

*Atkins* intellectual disability claims" whereas Halprin asserted his claim was *factually* unavailable because he was unaware of the evidence of judicial bias. *Id.* This Court rejected Halprin's attempt to "incorrectly conflate[] the 'previously unavailable' requirement of subsection (b)(2)(A) with the new 'factual predicate' standard found in subsection (b)(2)(B)(i)." *Id.*

In a footnote, Brown tries to distinguish *Halprin* on grounds that, unlike Halprin, Brown was not merely unaware of the evidence to support his claim, but the evidence was "legally unavailable" to him due to State misconduct. Motion at 39 n.15. But, unlike *Cathey* and *Johnson,* the standards for evaluating *Brady* claims have not changed—Brown must still prove that the State withheld favorable, material evidence. And just like *Halprin,* his argument "incorrectly conflates the 'previously unavailable' requirement of subsection (b)(2)(A) with the new 'factual predicate' standard found in subsection (b)(2)(B)(i)." 788 F. App'x at 944. Indeed, to demonstrate that his *Brady* claim was unavailable to him, he must do more than allege suppression. *See Blackman,* 909 F.3d at 778-79 (refusing to collapse § 2244(b)((2)(B)(i) diligence requirements into *Brady* duty of disclosure, as statutory requirements for successive

petitions must be considered before merits); *Johnson,* 442 F.2d at 911 ("In light of the plain text of AEDPA and our caselaw, we must conclude that a successive petitioner urging a *Brady* claim may not rely solely upon the ultimate merits of the *Brady* claim in order to demonstrate due diligence under §2244(b)(2)(B) where the petitioner was noticed pretrial of the existence of the factual predicate and of the factual predicate's ultimate potential exculpatory relevance.") Brown still must prove diligence in his efforts to develop his claim—a fact in contention for this *Brady* claim. *See* Section I(B)(1), infra.

Like Halprin, Brown proposes an extension of *Cathey* and *Johnson*—which turned on the *legal* unavailability of a claim—to his claim because it was allegedly *factually* unavailable at the time he filed his first petition. But his proposed extension of *Cathey* and *Johnson* is contrary to the Supreme Court's interpretation of § 2244(b)(2)(A). *See Tyler v. Cain*, 533 U.S. 656, 661–62 (2001). It also ignores Congress's intent in treating legally and factually unavailable claims differently and would nullify subsections (B)(ii). In other words, Brown's interpretation of subsection (A) defies Supreme Court precedent and more than one canon of statutory construction.

Subsection (A) requires a petitioner to "show[] . . . the claim relies on a new rule of constitutional law . . . that was previously unavailable." Subsection (B) requires a petitioner to show "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" *and* the facts underlying the claim "would be sufficient to establish . . . that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." § 2244 (b)(2)(B)(i)–(ii). Consistent with the plain language of the statute, the Supreme Court has interpreted subsection (A) to apply to "certain claims [that] rely[] on new rules of constitutional law," and subsection (B) to apply to "claims predicated on newly discovered facts that call into question the accuracy of a guilty verdict." *Tyler*, 533 U.S. at 661–62. But Brown's interpretation of the statute reads into subsection (A) an exception for claims predicated on newly discovered facts irrespective of whether they bear on a petitioner's guilt or whether he showed diligence in trying to discover them.

Congress knew how to provide for successive petitions based on new factual developments, as it did precisely that in subsection (B). Its omission of factual-predicate language from subsection (A) and inclusion

of same in subsection (B) demonstrates its presumptive intent to treat legally and factually unavailable claims differently. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship."). Notwithstanding the Supreme Court's interpretation of the statute and Congress's presumptive intent, Brown reads into subsection (A) language that is not there. He conflates subsections (A) and (B)(i) in a way that renders (B)(ii) superfluous. If he is correct that subsection (A) allows a petitioner to file a successive petition when he discovers a claim late, with no regard for diligence or innocence, then no petitioner would ever need to invoke subsection (B)—and, given subsection (B)(ii)'s stringent innocence requirement, no petitioner would. Congress deliberately chose to preclude successive petitions based on late-discovered claims that do not exculpate a petitioner. Brown asks this Court to interpret subsection (A) in a way that would "render [subsection (B)(ii)] inoperative.'" *See CSX Transp. Inc. v. Ala. Dept. Rev.*, 562 U.S. 277, 291 (2011). As it did in *Halprin,* this Court should follow the law as Congress enacted it. It should apply

subsection (B) to Brown's claim, which is based on his allegation that his *Brady* claim was factually unavailable until his newly appointed state and federal habeas counsel took steps to look at the Harris County District Attorney's file in 2022.

### B.  Brown's claim is barred by § 2244(b)(2)(B).

This Court should deny this motion for authorization because Brown cannot demonstrate that (1) the factual predicate for his claim could not have been discovered previously through due diligence, and (2) that the facts, taken as true, would show by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found him guilty of capital murder.  § 2244(b)(2)(B).

### 1.  Brown fails to show diligence as required by § 2244(b)(2)(B)(i).

Brown cannot satisfy the diligence requirement of § 2244(b)(2)(B)(i), which requires a showing that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence[.]" Brown fails to demonstrate that he could not

have discovered the videotape evidence before he filed his first federal habeas application.

Brown attempts to demonstrate the diligence required by the federal statute by thoroughly describing the efforts taken by trial counsel to obtain *Brady* information at trial. Motion at 43–45; *see also* Motion at 7–13. Brown also thoroughly describes the steps taken by new state habeas counsel, the Office of Capital and Forensic Writs (OCFW), who were appointed in May 2022, to locate this evidence; and current federal habeas counsel, who were appointed in February 2023, to pursue this current motion. Motion at 25–28.

But Brown conveniently omits any reference to the steps taken by previous federal habeas counsel to obtain this information for use in filing his first federal habeas petition. Indeed, Brown mentions Alex Calhoun and Paul Mansur—both of whom remained counsel of record until replaced by the Federal Public Defender in February 2023, *see* DE 63, 65—only once. Motion at 22. Evidence presented by the State in response to a similar claim raised in Brown's second subsequent application for state habeas relief—which Brown filed in the CCA on the same day as the instant motion for authorization—demonstrates that federal habeas

counsel had access to this evidence and opportunity to not only make a copy of the recording, but to file an amended petition raising a claim relying on this evidence in his first federal habeas petition.

In an affidavit, Meagan Scott, Assistant District Attorney assigned to the General Litigation Division of the Harris County District Attorney's Office (HCDAO), stated:

> The HCDAO file for *State of Texas v. Arthur Brown*, Cause No. 0636535, is comprised of three banker's boxes. A VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" is contained within Box No. 3 of that file.
>
> HCDAO records from the General Litigation Division (attached to this affidavit) reflect that Alexander Calhoun submitted a TPIA [Texas Public Information Act] request related to the file for Arthur Brown on October 16, 2008, and that his request was completed on October 16, 2009. The VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" would have been available for Mr. Calhoun to review or request for duplication as part of that request.
>
> HCDAO records from the General Litigation Division (attached to this affidavit) reflect that Paul Mansur submitted a TPIA request related to the file for Arthur Brown on June 18, 2014, and that his request was completed on July 21, 2014. The VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" would have been available for Mr.

Mansur to review or request for duplication as part of that request.

Director's Attachment, at 1.[10]

While the TPIA request was completed after Brown's federal habeas petition was filed on January 12, 2009, DE 1, it was completed *before* the Director filed his motion for summary judgment on July 15, 2010, DE 23, and well before the district court denied relief on June 12, 2012. Federal habeas counsel could have filed a motion to amend his federal habeas proceeding with this claim. *See* Fed. R. Civ. Proc. 15(a); *see also In re Milam,* 838 F. App'x 796, 799 (5th Cir. 2020) (Declining authorization for successive filing finding *Atkins* claim "previously available" in prior habeas pleading because movant "had sufficient opportunity to amend his habeas petition to include an *Atkins* claim after *Moore* was decided, but failed to do so."); *see also In re Soliz,* 938 F.3d 200, 204 (5th Cir. 2019) (*Atkins* claim was previously available where Soliz filed amended application "years after the DSM-5 was published,"

---

[10]    This affidavit will be part of the State's response in opposition to Brown's second subsequent application for state habeas relief, which the Harris County District Attorney's Office has indicated will be filed on Sunday, March 5, 2023. Because Brown simultaneously filed this claim in both the state and federal court, this Court does not have the benefit of the state court's record or ultimate decision. Nevertheless, this affidavit will be part of the state court record and should be considered by this Court in resolving this motion.

and *Cathey* was decided four months before the district court denied relief.).

Brown cannot now suggest that federal habeas counsel could not have known the significance of this evidence. Indeed, in this motion, Brown cites to trial counsel's closing argument referencing this tape, asserting, "What did Anthony Farias have that was so important that they videotaped it and why isn't he here to testify?" 39 RR 92–93. Diligent counsel was certainly on notice of a potential federal habeas issue and would have utilized the tape when discovered in the file in 2009.

Because federal habeas counsel had full access to this evidence during the pendency of his federal habeas proceeding, Brown fails to show that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." Therefore, his claim fails to satisfy §2244(b)(2)(B)(i).

## 2. Brown fails to show innocence as required by § 2244(b)(2)(B)(ii).

Brown argues that, with the videotape evidence, he meets the statutory requirements of innocence. Motion at 45. That is, "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence

that, but for constitutional error, no reasonable factfinder would have found the Applicant guilty of the underlying offense." § 2244 (b)(2)(B)(ii). To obtain authorization to file a successive claim, Brown must demonstrate that "there is possible merit to his claim that, if the withheld evidence had been provided, no reasonable juror would have found [him] guilty" of the murder of these four people. *In re Will,* 970 F.3d 536, 544 (5th Cir. 2020).

Brown places far too much significance on the videotape evidence in which Anthony Farias speculates as to the identity of the shooters based upon a hearsay statement from his mother, Rachel Tovar, that "Red" and "Squirt" committed the crime. *See* Appendix at 298-300, 345, 394-96. First, Anthony Farias was not present at the house when the assailants entered or when the victims were shot. He was not a witness to this crime and did not personally see the assailants. Any information he provides is pure speculation founded upon hearsay. Therefore, his speculation that Red was a man named "Terrell" and Squirt was his brother, who was at least seven feet tall, is just that—speculation.

Furthermore, this speculation lacks credibility at the outset. If Squirt was indeed the man Farias believed him to be, the fact that he

was seven feet tall would be a particularly unusual and notable characteristic, even if the man was seen only in the dark. *See* Motion Appendix at 376-77. Yet, not one witness to the crime, nor victim of the crime described any assailant as being of an abnormal height. *See* 27 RR 86 (Tovar's initial description to police officers identified Squirt as 5'6" or 5'7", second suspect 5'1" to 5'2" and third suspect 5'1 to 5'2"); 29 RR 318, 322-26; 30 RR 103-04 (Bervis Ned's testimony of seeing a black man walking back and forth from house to van, could not tell how tall he was); 32 RR 164-65, 180-81 (Candelario Hernandez saw two black men come out of house after shots fired, could not identify them because of the dark, men were almost the same size, neither fat nor skinny); 41 RR SX 46 (Affidavit of FBI Agent Barry Loggins: Rachel Tovar described Squirt as 6'3"). This fact alone renders Farias's alleged identification unreliable as it does not comport with the testimony of those who actually witnessed the crime.

Furthermore, Farias admits that he does not know Squirt very well, *see* Motion Appendix at 300, 376, and could not name him, Motion Appendix at 285, 376. Later, Farias indicates that Tovar had previously sold narcotics to "Squirt." Motion Appendix at 391. This is of note

because, while cumulative of evidence that Tovar sold narcotics, 31 RR 143, it buttresses Tovar's ability to later identify Brown as the perpetrator. At least one trial witness, other than Tovar, confirmed that Brown went by the nickname "Squirt." 28 RR 98-99 (Raylon Johnson identified Brown as "Squirt"); *see also* 31 RR 132-33 (Tovar identifying Brown in the courtroom as "Squirt"). And, contained within the Movant's appendix are statements from Brown's sister, Carolyn Momoh, that are replete with references to Brown as "Squirt." *See* Motion Appendix at 168-69, 171, 178, 187, 192, 206-08.

Further, Farias's identification of Red as "Terrell" is not so certain. Movant Appendix at 284 ("Red is named Terrell. . . . I think. I'm not too sure, but … ."). Farias could be wrong about Red's actual name. In any event, he does not identify Red as Terrell *Hill,* as suggested by Brown. *See* Motion at 47. He only identifies him as Terrell. *See* Motion Appendix at 283-85, 347. At trial, Tovar denied knowing anyone by the name of Terrell Hill. 32 RR 133.

While trial counsel now attest that they could have used this evidence to support their trial theory that Terrell Hill was the alternate perpetrator, Farias's speculation must be viewed in the context of

evidence presented by the State in rebuttal to this theory—specifically, witnesses La Tonya Yvette Hill and Ola Denise Ruthledge testified that Terrell Hill was in Tuscaloosa, Alabama on the evening of the mass murder. 38 RR 114, 139. Farias's speculative identification, without having witnessed the crime, does not overcome this evidence.

Finally, that Farias may have heard Red and Squirt call themselves brothers does not prove they were actually related. *See* Appendix at 283-84, 348. Regardless, this information is consistent with Rachel's witness statement given to the police on July 7, 1992, in which she stated that Red and Squirt were half-brothers. 41 RR SX 82, at 2. This information is not new.

In short, nothing contained within the videotaped statement exculpates Brown. The statement is inconsistent with the evidence of the other eyewitnesses, and is pure speculation. It does not rise to the level of clear and convincing evidence required by § 2244(b)(2)(B)(ii) to demonstrate innocence of this crime.

While trial counsel Patricia Saum says she would have used this evidence at trial, it is unclear how. Offense reports and witness statements are generally not admissible to show another witness's

capacity for truthfulness or untruthfulness. *See Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993). The statement could have been admissible if the defense called Farias as a witness. But considering he did not witness the murders and can only speculate as to the identifies of Red and Squirt, his testimony would have added little value. And this speculation would not suffice to overcome the identification of Brown by the two surviving victims—Rachel Tovar and Nicolas Cortez, 31 RR 14-22, 132-33, 184-97, 223-27; *see also* 27 RR 84-86; and an additional witness who saw Brown at the house prior to the murders, 30 RR 175-78 (Daniel Leija). And, as noted, another witness confirmed that Brown went by the nickname, Squirt. 28 RR 98-99.

The videotape evidence, by itself, is not exculpatory and lacks credibility. It fails to rise to the level of "clear and convincing evidence" necessary for a reasonable factfinder to conclude Brown was not guilty of the underlying offense, as required by § 2244 (b)(2)(B)(ii). But Brown attempts to bolster his claim with additional evidence developed after trial: 1) The testimony of witness Nicolas Cortez from Brown's co-defendant's 1995 trial in which he appeared less certain of his identification of the gunmen, Motion at 23-24; and (2) ballistics evidence

developed in the trial court in support of his 2014 subsequent state writ application, undermining the firearms examiner's testimony that the bullets recovered from the bodies were unequivocally fired from a gun tied to Brown, Motion at 24-25. This evidence was the subject of Brown's first subsequent state habeas application, denied by the CCA in 2015.

Regarding Cortez's testimony, the CCA declined to authorize this claim for review in a successive petition, dismissing it as an abuse of the writ for failing to satisfy Article 11.071 § 5(a). *See Ex parte Brown,* 2017 WL 4675396, at *2. Brown does not now provide copies of the transcripts for Cortez's testimony at these other trials and the Director is unable to verify this representation of the evidence in such a short time. However, from Brown's summary, he essentially argues that, while Cortez identified Brown only after seeing him at his trial, 31 RR 18, 25-26; at co-defendant Dudley's trial, he was unable to identify either gunman, he admitted "it was a little dark, I don't remember very well," and that he "couldn't see because they told me not look at them otherwise they'd kill me." Motion at 23-24. At Dunson's trial, Cortez was "vague in what he remembered" and unable to identify the men from photo lineup. Motion at 24. This is not inconsistent with Cortez's testimony at Brown's trial.

Cortez's inability to identify Dudley or Dunson is irrelevant—he did not do so at Brown's trial. And Cortez was cross-examined at length on the credibility of his sudden in-court identification of Brown when he had not previously been able to pick Brown out of a photo lineup. 31 RR 88-92. That he still could not pick Brown out of a photo lineup is not inconsistent with his trial testimony. This evidence does not provide clear and convincing evidence, even in conjunction with other evidence, of Brown's innocence.

Regarding the ballistics evidence claim, the CCA denied relief holding:

> We note at the outset that none of the experts were certain what type of ammunition was used in the shootings, and both Love and Eudaley acknowledged the possibility that different ammunition could lead to different results. But even if we assume the falsity of Anderson's testimony about his ballistics testing results, which were confirmed prior to trial by secondary examiners Donald Davis and Raymond Klien, [Brown] has not shown that this evidence was material at guilt/innocence or punishment.[11] The jury was authorized to convict [Brown] of capital murder as a party to the offense. And the State presented evidence that [Brown], at the very least, intended to kill the victims or anticipated that a human life would be taken. For example, the surviving witnesses observed [Brown] holding victims at gunpoint, tying them up

---

[11]     Davis and Klien signed affidavits that were admitted as exhibits at the habeas hearing. [Footnote in original].

with bedsheets, and verbally threatening to kill them. After the offense, [Brown] quickly left Houston on a plane and paid his sisters to drive his van back to Alabama. One of his sisters told police that [Brown] admitted to her that he had shot and killed "six Mexicans." She also testified at trial that she owned a Charter Arms .38 revolver that went missing after [Brown] had been in Houston.

Under the circumstances presented in this case, [Brown] is not entitled to relief on the remanded claim. Based upon our own review, we deny relief on [Brown's] claim that the State engaged in prosecutorial misconduct by presenting Anderson's ballistics testimony at trial.

*Id.* at *2.[12] This remains true.

As noted by the CCA in their summary of the evidence, Brown was known drug associate of the victims, he was seen at the house on the night of the murders by one witness, he was identified as an assailant by the two victims, his sisters testified that he and three friends were driving a tan minivan with Alabama plates—similar to that seen at the crime scene—on the day of the murders, and that evening he paid his sisters $1,000 each to drive the minivan back to Alabama. *Brown v.*

---

[12]     Brown did not seek authorization from this Court to file a successive writ in the federal district court on either claim after the 2015 denial, thus he is now time-barred from pursuing relief on either. *See* § 2244(d)(1). Brown did raise a similar ballistics claim alleging the knowing presentation of false testimony in federal court on his first federal writ, which the district court denied, *Brown v. Thaler,* 2011 WL 798391, at *17-19, but he did not seek COA from this Court.

*Thaler,* 2011 WL 798391, at *1-2 (citing *Brown, Jr. v. State*, No. 71,817, slip op. at 31-33). Speculation from a non-witness that Rachel Tovar was referring to a different "Red" and "Squirt"—speculation that does not comport with the evidence or her actual identification, a witness's continued inability to pick Brown from a photo lineup in several trials, and evidence challenging whether he was a shooter or just an accomplice, is not clear and convincing evidence sufficient to demonstrate that the jury would not have convicted him at the time of trial.

Brown therefore fails to meet either requirement of § 2244(b)(2)(B). For this and all the foregoing reasons, the Court should deny his motion for authorization.

### 3.   Brown's *Brady* claim fails on the merits.

To be entitled to relief under *Brady v. Maryland,* 373 U.S. 83 (1963), a petitioner must prove that (1) evidence favorable to the accused, because it is either exculpatory or impeaching, (2) was suppressed by the State, either willfully or inadvertently; and (3) was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Brown must show "a reasonable probability of a different result" in order to demonstrate the materiality

of the allegedly suppressed evidence. *Id.* at 699 (quoting *Kyles v. Whitely*, 514 U.S. 419, 434-35 (1995)).

First, the Director does not concede suppression at trial. Brown suggests that this evidence was part of an *in camera* review performed by the trial court. *See* Motion at 2 (The trial court took "the unusual step of requiring the State to turn over all potentially exculpatory information for *in camera* review. Yet, even then, Mr. Farias's interview was not turned over to counsel."); Motion at 11 (trial court granted *in camera* review of *Brady* material related to Rachel Tovar's drug dealing, citing CR 222-26); Motion at 12 (Houston Police Department ordered to provide offense reports for *in camera* review, CR 247); *id.* (State ordered to provide exculpatory information regardless of form, and all "written or oral statements of any person, whether to be called as a witness by the State or not" for *in camera* review, CR 276-85).

If the State complied with these orders and turned the information over for *in camera* review, and the trial court did not conclude that such information should be turned over to the defense, this determination should be considered an implicit determination of the facts, i.e., the Court concluded the evidence was not *Brady* in that it was neither favorable,

exculpatory, nor material. Factual determinations by a state court—even implicit ones—are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *Thomas v. Lumpkin,* 995 F.3d 432, 444 (5th Cir. 2021); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001) ("The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact.") And if the State complied with the *in camera* inspection and turned the information over to the trial court for determination, then the State cannot be said to have failed to comply with disclosure requirements.

Regardless, Brown fails to demonstrate that the evidence was either exculpatory or favorable. As discussed above, the speculative testimony from Anthony Farias based upon hearsay statements from his mother is not exculpatory. Farias was not an eyewitness and the speculative identification of Red and Squirt is unreliable. It does not undermine the identification of Brown as both Squirt and one of the assailants made at trial.

Regardless, the evidence is not material as it could not have undermined the credibility of the evidence admitted at trail. As noted above, Brown was identified by two of the victims—including Rachel Tovar—as one of the assailants, another witness identified Brown as being on the scene; and another witness confirmed that Brown went by the nickname, Squirt. He was seen driving a minivan with Alabama license plates, similar to that seen at the crime scene, and he paid his sisters to drive that van back to Alabama for him. The speculative identification from a non-witness of "Squirt" as a seven-foot-tall man does not comport with the evidence at trial. And Farias does not identify Terrell Hill by last name, only first. Even if trial counsel could have tried to use it to support the defense that Terrell Hill was the actual shooter, it would not have been credible. This evidence does not provide "a reasonable probability of a different result" had it been turned over. *Banks*, 540 U.S. at 699.

Finally, this claim would likely be procedurally barred if presented to the district court. As noted, it is currently pending before the CCA in an application to file a subsequent writ pursuant to Article 11.071 § 5(a). Because of the late and simultaneous filing of both pleadings on the same

day—eight days before his scheduled execution date—this Court does not have the benefit of the state court resolution of the claim. However, given the availability of this evidence at the time Brown filed both his first and second subsequent applications, the CCA will likely dismiss this claim as an abuse of the writ. Therefore, the claim will be exhausted but procedurally barred pursuant to an adequate and independent state procedural ground. *Hughes v. Quarterman,* 530 F.3d 336, 342 (5th Cir. 2008). The district court's inability to review the claim provides yet another reason for this Court to deny authorization to file a successive writ in the federal district court.

## C. The statute of limitations precludes authorization.

Section 2244(d)(1) applies a one-year limitations period to any application for writ of habeas corpus. The limitations period begins running from the latest of:

> **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> **(B)** the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> **(C)** the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made

retroactively applicable to cases on collateral review; or

**(D)** the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

For the purpose of this motion, and presuming without conceding that the evidence could not be obtained at the time of trial, the latest of these contingencies occurred when federal habeas counsel was given access to the Arthur Brown files, which contained this video tape—October 16, 2009. Because the instant motion was not filed until March 1, 2023, it is more than twelve years too late, and well outside the one-year limitation imposed for filing under § 2244(d).

While he alleges *Brady* violations at the time of trial, no State action prevented him from obtaining the evidence to support this claim as early as 2009. Indeed, according to the State's affidavit, he was given access to the tape at least twice in the past twelve years.

This Court has "the authority to deny a motion to authorize based on timeliness." *In re Campbell*, 750 F.3d 523, 532 n.9 (5th Cir. 2014). The Court should now conclude that any successive petition based upon this evidence is untimely.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that this Court deny Brown's Opposed Motion for Order Authorizing the District Court to Consider Second or Successive Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2244.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

s/ Tomee M. Heining
TOMEE M. HEINING
Deputy Chief, Criminal Appeals Division
Texas Bar No. 24007052
        *Counsel of Record*

P.O. Box 12548, Capitol Station
Austin, Texas 78711
Telephone: (512) 936-1600
Fax: (512) 320-8132
Email: tomee.heining@oag.texas.gov

*Attorneys for Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2023, I electronically filed the foregoing document with the clerk of the court for the United States Court of Appeals for the Fifth Circuit, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means: Jeremy Schepers and Derek VerHagen.

s/ Tomee M. Heining
TOMEE M. HEINING
Deputy Chief, Criminal Appeals Div.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

I hereby certify that this Brief in Response complies with Federal Rule of Appellate Procedure 32(a) in that it contains 8,809 words. Microsoft Word, Century Schoolbook Font, 14 points.

s/ Tomee M. Heining<br>
TOMEE M. HEINING<br>
Deputy Chief, Criminal Appeals Div.

**ELECTRONIC CASE FILING CERTIFICATIONS**

I do hereby certify that: (1) all required privacy redactions have been made; (2) this electronic submission is an exact copy of the paper document; and (3) this document has been scanned using the most recent version of a commercial virus scanning program and is free of viruses.

s/ Tomee M. Heining<br>
TOMEE M. HEINING<br>
Deputy Chief, Criminal Appeals Div.

# Director's Attachment

**THE STATE OF TEXAS**

**COUNTY OF HARRIS**

### A F F I D A V I T

BEFORE ME, the undersigned authority, personally appeared Meagan Scott, who upon being duly sworn, deposed and stated as follows:

My name is Meagan Scott. I have personal knowledge of the facts stated in this affidavit. I am more than twenty-one years of age, am of sound mind, and am otherwise competent to testify.

I am an Assistant District Attorney assigned to the General Litigation Division of the Harris County District Attorney's Office (HCDAO). The General Litigation Division is responsible for the HCDAO's compliance with the Texas Public Information Act (TPIA), and I supervise the processing of TPIA requests within that division.

The HCDAO file for *State of Texas v. Arthur Brown*, Cause No. 0636535, is comprised of three banker's boxes. A VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" is contained within Box No. 3 of that file.

HCDAO records from the General Litigation Division (attached to this affidavit) reflect that Alexander Calhoun submitted a TPIA request related to the file for Arthur Brown on October 16, 2008, and that his request was completed on October 16, 2009. The VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" would have been available for Mr. Calhoun to review or request for duplication as part of that request.

HCDAO records from the General Litigation Division (attached to this affidavit) reflect that Paul Mansur submitted a TPIA request related to the file for Arthur Brown on June 18, 2014, and that his request was completed on July 21, 2014. The VHS tape labeled "Interview with Anthony Roy Farias Incident # 66563392" would have been available for Mr. Mansur to review or request for duplication as part of that request.

The facts stated herein are true and correct.

1

_____
MEAGAN SCOTT

SWORN TO AND SUBSCRIBED before me on this the 2nd day of March, 2023.

MARY E. MARTINEZ
Notary Public-State of Texas
Notary ID #559737-5
Commission Exp. DEC. 20, 2026

_____
**NOTARY PUBLIC**
in and for Harris County, Texas

2

| | | | | |
|---|---|---|---|---|
| 11-3-08 | Mary Samman | Wilson Brooks | 864001 | Completed 11/11/08 | **1 – FF** |
| 10-30-08 | Mary Romero – State of California – Attorney General | Arthur Rothmeier | 174th – 848363 – requesting a copy of a final disposition | Completed 10/30/08 | |
| 10-29-08 | Casey Collins – Federal Public Defender | German Armando Coreas | 858585 | Completed 12-12-08 SD | **1 – FF** |
| 10-29-08 | Edward Sillas | Irma Cruz | 1519759 | Request withdrawn 10-31-08 | |
| 10-29-08 | James Randall Smith | Jeffrey James Davenport | 930753 | Completed, copies released 2/11/09 – SD | **1 – FF** |
| 10-28-08 | Dennis F. Spurling | Barry Adams | 1072595 | Completed 11/13/08 | **1 – FF** |
| 10-27-08 | Cynthia Henley | Christopher Benjamin | 1029285 | Completed 12-4-08 | **1 – FF** |
| 10-27-08 | Cynthia Henley | Luis Alberto Garcia | 1185059, 8090035, 1070559 | Completed 1-10-09 BR | |
| 10-27-08 | Yolanda Torres | Stafford Joseph Demouchette | 1172000 | Closed out as old, 9/16/09 - BR | |
| 10-22-08 | Michael R. Wadler | Modesto Medina | 1523103 – DWI Video | Completed 10-24-08 | |
| 10-22-08 | Shawn McDonald – TSU Thurgood Marshall School of Law | Wilfred Fontenot, Jr. | 353316 | Completed 1/23/09 | |
| 10-22-08 | Josh Schaffer | Deshun Thomas | 786932 | Completed, copies & video released 2/2/09 - BR | **2 – Boxes** |
| 10-21-08 | Manuel Rosa, IV – US Army Recruity | Rafael Velasco | 1215833 & 1215834 – Misd files | Records destroyed after 2 years, letter issued 10/21/08 - JM | |
| 10-21-08 | Ward Larkin | Robert Alan Fratta 0712409 | Requesting a copy of all video tapes – police interview | With SD | |
| 10-17-08 | Robert G. Walker, II | Self - Inmate | 919754 | Letter being sent –no records released 10-17-08 | |
| 10-17-08 | Randy Schaffer | Navid Ghahremani | 1030953 & 1030954 | Completed 12-29-08 | **1 – Box** |
| 10-16-08 | Alexander Calhoun | Arthur Brown | 636535 | Completed 10-16-09 | **3 - Boxes** |

| 6-18-14 | Casie Gotro | Lyla Rodriguez | 1416297 | Completed, 6/25/14 BR | |
|---------|-------------|----------------|---------|----------------------|--|
| 6-18-14 | Margarett Vozar | Latif Ullar | 1322270, 1737076, and 1155817 (all pending) | Completed 6/19/14 JM | |
| 6-18-14 | Wade B. Smith | Any and all policies and procedures of the Environmental Crimes/Major Offenders Division related to the intake, | to the intake, investigation, prosecution or otherwise handling of environmental crimes related to illegal dumping | Completed 6-25-14 SD | |
| 6-18-14 | Paul E. Mansur / Texas Defenders Service | Arthur Brown | 636535 (Death) | Completed, 7/21/14 MS | 3 boxes |
| 6-18-14 | Mary Samaan | Adam Wade Buchanan | 1320820 | Completed, 7/3/14 JM | |
| 6-17-14 | Christopher Cochran | April Soley Murillo Caicedo | 1955327 | Completed 6-24-14 JM | |
| 6-17-14 | Parris Mendoza | Skye Bartusiak | 1891515 | Completed 7/1/2014 MS | |
| 6-17-14 | Paris Mendoza | Skye Bartusiak | 1894563 | Completed 7/1/2014 MS | |
| 6-17-14 | Arkansas Department of Corrections / Ollie Urquehart | Timothy L. Storment | 0558875 | Completed 6/20/14 MS | |
| 6-17-14 | Brooke Martin / Higbee & Associates | Porter Delmus Mahoney, Jr. | Request says charges never filed / arrest date – 10/21/1968 | Closed out – see email 6/17/2014 ZG | |
| 6-16-14 | Daniel Carmichael / Texas Education Agency | Stephen Richards | 1318783 | Completed 6-25-14 JM | 2-FF |
| 6-16-14 | Tanya L. Terry / Public Defender's Office | Raymond Darnell Oaks | 984855 | Closed out 6-30-14 SD **File transferred to M. Wurzer (337th) to handle the request** | 1-FF |
| 6-16-14 | Deborah Tramel Owen – Texas Education Agency | John Christopher Lo | ███████ | Completed 06/25/14 JM | 1 –FF |
| 6-16-14 | Joshua Somers | Self | Personnel File | Completed 6/26/14 SD | |
| 6-16-14 | Mary Samaan | Johnny Mott | 1340670 | Completed, 7/3/14 JM | 1 Box |